### ROOS v. METROPOLITAN CASUALTY INS. CO. OF NEWARK, N. J., et al.

### No. 6122.

Court of Appeal of Louisiana. Second Circuit.

April 4, 1940.

Wise, Randolph, Rendall & Freyer, of Shreveport, for appellants.

Simon Herold, of Shreveport, for appellee.

DREW, Judge.

Plaintiff instituted this suit to recover the sum of $3600, $100 of said amount alleged to be for dentist's bill and $3500 for personal injuries, resulting from his running into a car of the defendant while same was parked at the Broadmoor Softball Park, in Shreveport, Louisiana, on June 24, 1938. He alleged that he crashed into the car while attempting to field a fly ball in the course of play.

The negligent acts charged to defendant are (1) parking his automobile on the playing field when he knew a softball game was in progress; (2) allowing his car to remain parked on the playing field in this manner; and (3) not warning petitioner that the automobile was parked on the playing field.

In answer defendants deny each and every allegation of the petition and deny that said accident and resulting injury therefrom were the result of any fault or negligence on the part of defendant, but aver that the sole cause and, if not the sole cause, the proximate cause of the accident was the fault and negligence of plaintiff himself in not keeping the

proper lookout while running, and in failing to use due and ordinary prudence and care to see the automobile of defendant, and further in knowing that the automobile of defendant was parked; and further, that plaintiff herein should have known that said automobile was parked as it was parked and he should have used due prudence and ordinary care to determine the position of the car.

·In the alternative, if it should be held that defendants, or either of them, were guilty of any of the negligence as set out in the petition, which is denied, which is held to be the proximate cause of said accident and injury, defendants represent that the negligence of plaintiff himself contributed to such accident to an extent that without the same it would not have happened, and which contributory negligence bars plaintiff's recovery.

On these issues the case went to trial, resulting in a judgment for plaintiff in the sum of $750. Defendants have perfected this appeal and plaintiff has answered praying that the amount of the award be increased to $1600.

█ The first controversial fact to determine in the case is,—Was defendant's car parked on the playing field?

For the past several years, softball has become a popular recreation for young business and professional men in Shreveport and in general. Almost every profession and business establishment has a softball team. Leagues have been formed and the games are played according to schedule. On the night of the accident to plaintiff (the game was played under electric lights), a team representing the banks of the City, composed of bankers and their employees, was playing one representing the lawyers, composed of judges and attorneys. The game was in the third inning when Mr. Broyles, of the Banker's team, connected with a pitched ball and drove a hard liner into left field, which was being played by plaintiff. The ball was hard hit and was apparently going to the right of the left-fielder near the foul line and over his head. At the crack of the bat, plaintiff began running to his right and back, hoping to catch the ball. He got to the ball while it was still in the air and almost at the same instant it struck his gloved hand and bounced out, he crashed into the front of defendant's car. The ball was declared a fair one by the umpire. Several of the spectators rushed to the scene of the accident and when plaintiff arose from the ground, they learned he was hurt, so he was placed in a car and sent home.

It was customary for the spectators to park their cars to the left of the foul line on the left side of the playing field and on this night there were quite a number of cars parked there. The early comers parked near third base and the rest farther out near left field. Defendant's car was parked in what might be termed deep left field, some 200 to 250 feet from home plate.

The record discloses that the cars near third base were approximately 15 feet outside of the foul line, which marked the playing field. Each car that would be parked would protrude its front end a little nearer to the playing field in order to be in a position to see home plate from a seat in the car. Therefore, the farther the line of cars extended out into left field region, the nearer the car would be to the playing field.

The players who rushed to the scene of the accident immediately after it occurred are positive that defendant's car, into which plaintiff crashed, was extending nearly half its length into the playing field. A like number of witnesses, all bankers and employees of banks, are positive the car was parked entirely outside of the playing field. The testimony given by the bankers and their witnesses is not as positive and convincing as that of the lawyers and judge who testified. This is no doubt due to the fact that lawyers are better trained to look for details when an accident occurs than bankers are. No one questions the credibility of the witnesses on either side. The lower court found as a fact that the automobile was parked partly on the playing field and certainly, under the testimony in the record, we are not justified in holding that there was any manifest error in its finding on this fact.

The only remaining question as to liability is the plea of contributory negligence urged by defendants, that is, that plaintiff should have known the location of defendant's car and should not have run into it.

█ Plaintiff did know that cars were parked along the left field foul line, but did not know that defendant's car was parked partly on the playing field

and would not necessarily have known it unless he had gone over and made an inspection for that purpose. He knew the boundaries of the field and that there was a white chalk line extending all the way out to assist the umpire in calling fair or foul balls, and also to designate the playing field, in order that spectators might stay off of it. Plaintiff had the legal right to presume that no one would park his car on the inside of the playing field and was not called upon to inspect farther and see that they did not.

Softball is a very much faster game than baseball. It is played on a smaller diamond and a larger ball is used. The pitcher is limited to a certain manner of delivering his pitch to the catcher and, among amateurs, it is usually a free-hitting game. For one to successfully play the game, he must give his undivided attention to it and "keep on his toes". When the ball is hit, his entire attention must be given to it if he hopes to field it. He has no time to look elsewhere than at the pitched ball.

We fail to find any negligence in plaintiff's running after the ball as he did. If he had crossed the foul line and run into a car which was parked properly, he could not recover, but those are not the facts of this case. The car into which he ran was partially on the playing field where it should not have been; where it was negligence for defendant to park it, and where he should have known that a player would be likely to come in contact with it. We fail to find any contributory negligence on the part of plaintiff and he is entitled to recover for the damages he suffered.

■ The only injury of any consequence received by plaintiff was the breaking off of two teeth. It was admitted that Dr. Fred Ratzburg, a dentist and expert, would testify as follows regarding the injury to the two front teeth:

"That Dr. Ratzburg has known Armand W. Roos, Jr., plaintiff herein, for a number of years, having treated him professionally when dental work was required by Armand W. Roos, Jr., since his birth. That on the morning of June 25, 1938, Roos called at the office of Dr. Ratzburg for a professional treatment, and that Dr. Ratzburg examined the teeth of Armand W. Roos, Jr., and found that the two upper front teeth had been broken about half-way down and that the back of these two teeth were chipped all the way to the gum; that these two front teeth prior to this time had been examined by Dr. Ratzburg on numerous occasions and were in excellent condition and no cavities were found or signs of decay.

"That Dr. Ratzburg advised Armand W. Roos, Jr., that any immediate work if done at that time on the two teeth would cause great shock and would probably kill the nerves; that Dr. Ratzburg advised a delay of from four to eight weeks so that these teeth could recover from the shock they had received and also to determine whether or not the nerve would die. That sometime in the latter part of July or the first of August, Armand W. Roos, Jr., returned to his office to ascertain whether the time was proper or not for the capping of the injured teeth; that it was found that the time was proper and on a certain morning in the latter part of July or first of August, Armand W. Roos, Jr., came to his office about 8:30 A. M.; that Dr. Ratzburg gave Roos a local anesthetic and began to grind the teeth so as to cap them; that it required about three hours of constant grinding to get the teeth in proper order for capping. That it was then necessary to make a plaster of paris mold of Roos's mouth so that the artificial teeth or caps could be prepared from the mold; that after the mold was made, cellophane protectors were placed over the teeth to insure them from injury while the caps were being made. These cellophane caps were cemented to the ground teeth and on the following morning Roos called by his office to have the permanent caps placed in his mouth; that it was necessary to remove the temporary cellophane protectors which were cemented on the teeth the previous day and that it required in excess of two hours to perform this operation.

"That when the caps were finally cemented over the ground teeth, it was then necessary to grind on the lower teeth so as to give the caps the room they require, they being much larger than the original teeth, and that the caps that are now in Armand W. Roos, Jr.'s mouth are intended as permanent teeth, but that they can be broken and will have to be replaced if they are broken; that the caps are not as good as the original

teeth, no substitute being known in the medical profession to take the place of original teeth.

"That Dr. Ratzburg's bill in connection with this work was $100.00 and that same was a reasonable and just charge for the professional services rendered. That, in conclusion, there was evidence of a great deal of pain in the grinding of the teeth and also evidence of a great deal of pain in the securing of a mold or cast, and that there was evidence of a great deal of pain in the cementing and removing of the temporary cellophane caps and cementing of the permanent caps."

This testimony fairly states the injury. From it we find that the two front teeth are not an entire loss. The nerves were not killed nor the roots destroyed. This injury cannot be compared to the entire loss of two teeth.

The courts have awarded larger amounts than allowed by the lower court where the teeth were entirely destroyed, but we are convinced the award made by the lower court herein is a fair one for all concerned.

The judgment is therefore affirmed, with costs.

HAMITER, J., recused.